## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2457-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH L. MILLER JR.,
a/k/a JOSEPH L. MILLER,

     Defendant-Appellant.

_____

Submitted December 9, 2019 – Decided March 4, 2020

Before Judges Messano and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Accusation No. 14-02-0067 and Indictment No. 15-07-0803.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel S. Rockoff, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sarah D. Brigham, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant, Joseph L. Miller, Jr., appeals from his convictions for unlawful possession of a firearm, N.J.S.A. 2C:39-5(b), and possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3). Defendant pled guilty to these offenses as part of a plea agreement. The sole issue on appeal is whether the trial court properly denied defendant's Fourth Amendment motion to suppress a handgun, crack cocaine, and drug distribution paraphernalia found inside his grandmother's house. Defendant had fled into the house after police officers told him there was an outstanding warrant for his arrest.

We have reviewed the record and the parties' arguments in view of the applicable legal principles and affirm the denial of defendant's motion to suppress. The officers were duty-bound to execute the outstanding warrant and were authorized to follow defendant into his grandmother's home under the hot pursuit-exigent circumstances exception to the search warrant requirement. Once inside, that exception authorized police to look throughout the house for defendant. When they found him upstairs, they saw a revolver and crack cocaine in plain view. Defendant's grandmother thereafter gave consent for the officers to conduct a subsequent search of the residence. The officers found additional evidence during that consent search. We conclude that each police action

2

leading to the discovery of the firearm, crack cocaine, and other evidence was objectively reasonable and lawful.

## I.

A Middlesex County Grand Jury indicted defendant on eight counts, including weapons and drugs offenses. Defendant filed a motion to suppress the evidence found at his grandmother's house. After a hearing, the trial judge denied the motion in a written opinion. Defendant and the State then entered into a plea agreement that recommended a three-year prison term with a one-year period of parole ineligibility. The court sentenced defendant in accordance with the plea agreement. Defendant now challenges the denial of his suppression motion pursuant to Rule 3:5-7(d).

## II.

Defendant raises the following contention for our consideration:

> BECAUSE OFFICERS FAILED TO OBTAIN A SEARCH WARRANT BEFORE ENTERING A THIRD PARTY'S HOME IN ORDER TO EXECUTE AN ARREST WARRANT, THIS COURT SHOULD REVERSE THE DENIAL OF THE MOTION TO SUPPRESS.

## III.

The following facts were adduced at the suppression hearing. New Brunswick Police Officers Martinez and Runoff were patrolling a high-crime

3

neighborhood in uniform and in a marked police vehicle around 12:30 a.m. They observed defendant sitting on the front steps of 191 Seaman Street wearing a black "puffy vest," and they saw defendant's car parked in front of the house. Officer Martinez recognized defendant and his vehicle from a previous arrest.

The officers requested the police dispatcher to run a computer check on defendant and the vehicle. That query revealed that there was an active arrest warrant pending against defendant. It was later learned that the warrant had been issued for failure to pay a license restoration fee, N.J.S.A. 39:3-10a. The police dispatcher relayed the existence of the arrest warrant to the officers but did not tell them the basis for the warrant.

Two additional officers in another patrol car were dispatched to support the impending arrest. The four officers approached defendant and told him there was a warrant for his arrest. Martinez testified that defendant's eyes "widened." Defendant stood up, clutched his waistband with his right hand, and turned and fled into the home, slamming the front door in Officer Runoff's face. The officers kicked in the door and three of them entered the home. The other officer went around the rear of the house to ensure defendant did not escape via a back door.

Once inside, the officers began searching for defendant, starting on the first floor. There they encountered defendant's grandmother. They instructed her to stay in her first-floor bedroom for her own safety.

The officers heard noises coming from the second floor and proceeded upstairs, service weapons drawn. The upstairs hallway was dark and Officer Martinez called for defendant to surrender. Defendant announced that he was "coming out." Martinez saw defendant in the hallway with his hands raised. Defendant was standing a few feet from the open door of a bedroom near the stairs. The light in the bedroom was on.

Martinez noticed that defendant was no longer wearing the puffy vest he had been wearing when he fled into the house. Martinez handcuffed defendant. While still standing in the hallway, Martinez looked into the lit bedroom and observed the vest on top of the bed. Next to the vest was a plastic bag that contained a substance that Martinez immediately recognized to be crack cocaine. The officer also observed the brown and silver handle of a revolver sticking out between the box spring and mattress.

After defendant was arrested, defendant's grandmother, who owned the home, signed a consent-to-search form granting police permission to search the residence for additional evidence. That search resulted in the seizure of a digital

A-2457-17T1

scale, $2850 in cash, a Pyrex cup with cocaine residue, and fifty-two clear plastic baggies.

The trial court found that Officer Martinez "was a credible witness. He was forthright in his answers."

IV.

We begin our analysis by acknowledging general legal principles governing this appeal. When reviewing a trial court's decision in a motion to suppress, we defer to the court's factual findings so long as they are "supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). "By contrast, the task of appellate courts generally is limited to reviewing issues of law. Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo—"with fresh eyes" . . . .'" State v. S.S., 229 N.J. 360, 380 (2017) (emphasis omitted) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)). We need not defer, in other words, to a trial court judge's interpretive conclusions "unless persuaded by their reasoning." Morrison, 227 N.J. at 308 (citing State v. Goodwin, 224 N.J. 102, 110 (2016)).

A-2457-17T1

## A. Police Entry into the Home

We first address defendant's contention that the police unlawfully pursued him as he fled into his grandmother's home. Defendant asserts the municipal court arrest warrant based on his failure to pay a fee was insufficient to justify the police entry into the dwelling. He argues that police may pursue a fleeing suspect into a home only if they have probable cause to believe a serious offense, i.e., an indictable crime, has been committed. Defendant also contends that police needed a <u>search</u> warrant to enter the home of a third party—his grandmother—to look inside. We disagree with defendant's contentions. The officers were allowed to pursue defendant into the house because of the exigency created by his flight to prevent execution of a valid arrest warrant.

It is a foundational principle of search and seizure law that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980) (quoting <u>United States v. U.S. Dist. Court</u>, 407 U.S. 297, 313 (1972)). As our Supreme Court recently reaffirmed in <u>State v. Cope</u>, "[o]ur constitutional jurisprudence expresses a decided preference that government officials first secure a warrant before conducting a search of a home or a person." 224 N.J. 530, 545–46 (2016) (quoting <u>State v. Watts</u>, 223 N.J. 503, 513 (2015)). The

7

issue presented in this case focuses on the type of warrant that is needed to justify intrusion into the sanctity of a home when a wanted person flees into it with police in hot pursuit.

Defendant relies on State v. Bolte, 115 N.J. 579, 597 (1989), for the proposition that police in hot pursuit of a suspect may not barge into a home if there is only probable cause to believe the fleeing suspect committed a minor, non-indictable offense. Defendant's reliance on Bolte is misplaced for two reasons. First, at the moment police crossed the threshold of 191 Seaman Street, just after defendant ran inside and slammed the door shut, they had probable cause to believe defendant committed the indictable crime of resisting arrest as defined in N.J.S.A. 2C:29-2(a)(2). That statute provides in pertinent part that "a person is guilty of a crime of the fourth degree if he, by flight, purposely prevents or attempts to prevent a law enforcement officer from effecting an arrest." N.J.S.A. 2C:29-2(a)(2). Thus, the officers' pursuit into the residence did not involve a minor offense as in Bolte.[1]

---

[1] At the time Bolte was decided, fleeing from a motor vehicle stop was classified as a disorderly persons offense. Bolte, 115 N.J. at 597. That statute has since been amended to make motor vehicle eluding either a third- or second-degree crime, depending on whether such flight creates a risk of death or injury to any person. N.J.S.A. 2C:29-2(b).

Furthermore, in <u>Bolte</u>, police were not executing an arrest warrant. Rather, the pursuit that ended inside the defendant's home was based on the officer's observation of a motor vehicle offense. <u>Id.</u> at 581–82. The probable cause to arrest for motor vehicle eluding, in other words, had not been determined by a neutral and detached magistrate. <u>Bolte</u> simply does not address whether and in what circumstances police may pursue a suspect fleeing from execution of an outstanding arrest warrant.

Defendant also relies on <u>Steagald v. United States</u> for the proposition that police need a search warrant, not an arrest warrant, to arrest a suspect in a third-party's home.[2] 451 U.S. 204, 213 (1981); <u>accord</u> <u>State v. Miller</u>, 342 N.J. Super. 474, 479–80 (App. Div. 2001) ("These findings, in view of the absence of a

---

[2]  An arrest warrant suffices to authorize police to enter a suspect's own residence to effectuate his or her arrest. <u>Payton</u>, 445 U.S. at 603. The State argues that the officers in this case could reasonably have believed defendant resided in his grandmother's house because it was the registered address for his vehicle. The trial court, however, found that while it was undisputed that defendant's grandmother owned the house, "[t]he Court has no actual evidence before it to determine whether Defendant lived in a room at his grandmother's residence or merely stored his possessions there." Thus, there is no factual foundation to support the State's argument that defendant resided there for purposes of the <u>Payton</u> rule. Although we conclude that the arrest warrant was sufficient in this case to authorize the police entry, we do so because there were exigent circumstances arising from defendant's flight from the execution of the warrant, not because police were executing an arrest warrant at the residence of the person named in the warrant.

A-2457-17T1

search warrant and the State's concession that no exigent circumstances existed, compel us to affirm the order suppressing the evidence found incident to the arrest."); State v. Bell, 388 N.J. Super. 629, 636 (App. Div. 2006) ("[T]he police had no authority to enter his aunt's house to search for defendant without a search warrant.").

Defendant's reliance on Steagald and the New Jersey cases that follow it is misplaced because those cases did not involve the hot pursuit of a fleeing suspect. Indeed, the Court in Steagald framed the issue before it as "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." 451 U.S. at 212 (emphasis added). Likewise, in Miller, we recognized that an arrest warrant generally furnishes no authority to the police to intrude on the privacy of a home or to engage in a search therein "[i]n the absence of appropriate exigency, such as hot pursuit into the home." 342 N.J. Super. at 490 (emphasis added).

Although the cases defendant relies upon are easily distinguished, there is authoritative precedent that specifically addresses whether police may enter a dwelling forcibly when there is both an arrest warrant for a minor offense (e.g.,

failure to pay an assessment) and exigent circumstances generated when the suspect flees into the dwelling to frustrate execution of that warrant. As the trial court correctly noted, the outcome of defendant's motion to suppress is governed by our Supreme Court's unanimous decision in State v. Jones, 143 N.J. 4 (1995). The Court framed the critical issue in the very first sentence of its opinion:

> In this appeal, the issue is whether it was reasonable, under the Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution, for a police officer, following the fleeing subject of an outstanding arrest warrant, to enter a private residence using force if the officer did not know the offense underlying the warrant.
>
> [Id. at 7.]

We confront essentially the same issue in the case before us.

In Jones, police were conducting surveillance of an apartment complex following a report of a car break-in and theft. Id. at 8. The reason for the surveillance was unrelated to Jones. Ibid. "[O]fficers observed a vehicle containing Jones and a companion, Lonzie Collier, pull into the parking lot" of the apartment complex. Ibid. One of the officers recognized Collier from previous encounters. Ibid. The officer also remembered that he had seen an outstanding warrant for Collier's arrest earlier that evening. Ibid. The officer did not know the offenses underlying the issuance of the warrant. Subsequently,

11

the officer learned that the warrant was issued for Collier's failure to pay fines assessed for two prior convictions for possession of drug paraphernalia.  Ibid.

The officers exited their vehicle and approached Jones and Collier.  Ibid. The two men fled into an apartment building and then into apartment 312.  Id. at 9.  The officers gave chase and were not far behind the fleeing suspects.  Ibid. The police tried the apartment door, found it locked, and kicked it down.  Ibid.

On those facts, the Court upheld the forcible police entry into the apartment.  Id. at 17.  The Court explicitly rejected the defendant's claim that an arrest warrant for a minor offense such as failing to pay a court-imposed assessment is different from a warrant issued for a "non-minor" offense such as an indictable crime.  Ibid.  The Court reasoned it is not for police to second-guess a neutral magistrate's decision to issue a warrant.  Ibid.  Accordingly, the Court concluded that law enforcement officers are required to execute duly issued warrants and would be derelict in their duty if they fail to do so.  Id. at 14 (citations omitted).  The Court acknowledged, moreover, that police rarely know the underlying offense on which an arrest warrant is issued.  Id. at 16.  The Court therefore rejected as unworkable and unreasonable the defendant's contention that police may not chase fleeing suspects into private residences unless armed with a warrant for a "non-minor" offense.  Ibid.

A-2457-17T1

Defendant argues that the holding in Jones is limited to situations where police execute an arrest warrant of a defendant who is fleeing into his or her own home. In support of that interpretation, defendant relies on language in the opinion that quotes Payton. See id. at 13 ("'[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.' Thus, the police have the right to execute an arrest warrant on a defendant at his or her home . . . ." (emphases added by defendant) (quoting Payton, 445 U.S. at 603)).

We do not read the opinion or its rationale to apply only to situations where police are chasing the subject of a warrant into his or her own residence. Rather, we believe the Court's holding in Jones is set forth in the first sentence of the final section of the opinion: "Police officers acting pursuant to a valid arrest warrant have the right to follow a fleeing suspect into a private residence." Id. at 19 (emphasis added). The choice of "a" to describe the residence seemingly indicates that there is not a requirement that it be the defendant's residence. The Court's definitive statement, moreover, directly answers the legal question the Court framed in the first sentence of the opinion, which also

refers to "a" private residence and makes no mention of who resides there. Id. at 7.

We add that just as it would be unworkable and unreasonable to require pursuing police officers to determine the underlying offense on which an arrest warrant is issued, id. at 16, it would be unworkable and unreasonable to require pursuing officers to determine whether a suspect is fleeing into his or her own residence or is instead invading the residence of another, perhaps to take a hostage. The inherent exigency of a true hot pursuit—one where police are literally on the tail of a fleeing suspect—presupposes the need to make a split-second decision. That decision must be made based on limited information at hand and without an opportunity for patient investigation into why a defendant is fleeing from police or why he or she has chosen a particular premises in which to take refuge.

In sum, we conclude that Jones stands for the proposition that when a suspect flees from the execution of an active, lawfully issued arrest warrant, regardless of the reason for its issuance, police may pursue the suspect into a private residence without regard to whether the fleeing suspect is the homeowner, lawful resident, guest, or unwelcome intruder. See Kentucky v. King, 563 U.S. 452, 460 (2011) ("Police officers may enter premises without a

warrant when they are in hot pursuit of a fleeing suspect."); Steagald, 451 U.S. at 211–12 (noting police entry of a third-party's residence to search for a person named in an arrest warrant "here took place in the absence of . . . exigent circumstances," indicating the hot pursuit exception applies to third-party premises); U.S. v. Santana, 427 U.S. 38, 42–43 (1976) (holding a warrantless entry pursuant to hot pursuit was valid); State v. Thomas, 124 P.3d 48, 54–55 (Kan. 2005) (applying Santana when a suspect flees into the dwelling of a third party). Applying that principle to the case before us, the police entry into 191 Seaman Street was reasonable and lawful.

### B. The Police Search for Defendant Once Inside the Home

We turn next to defendant's contention that the police violated his Fourth Amendment rights because of the manner in which they searched for him inside his grandmother's house. Specifically, defendant contends the pursuing officers conducted an unlawful "protective sweep search" in violation of Maryland v. Buie, 494 U.S. 325 (1990), State v. Davila, 203 N.J. 97 (2010), and State v. Cope, 224 N.J. 530 (2016).

The protective sweep search doctrine is one of several recognized exceptions to the warrant requirement. Davila, 203 N.J. at 125. Defendant asserts that the State failed to establish that the officers were lawfully within the

residence for a legitimate purpose and that the officers had reasonable articulable suspicion to believe that defendant posed a danger to them. Buie, 494 U.S. at 327; Davila, 203 N.J. at 102 (conditioning police officers' ability to perform a protective sweep on whether "(1) police officers are lawfully within private premises for a legitimate purpose . . . and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger").

We have already determined that the pursuing officers lawfully entered the private premises for the legitimate purpose of executing a valid arrest warrant from which defendant fled. On these facts, we also do not hesitate to conclude the pursuing officers had ample reason to believe defendant posed a danger to them while he was on the loose inside the house, especially because he had reached towards his waistband before fleeing. See State v. Privott, 203 N.J. 16, 29–30 (2010) (noting the fact a suspect walked away from the officer and moved one hand towards his waistband—an area commonly used by armed persons to conceal a weapon—was part of the totality of the circumstances that would lead an officer to have objectively reasonable concern for his or her safety). Thus, the facts presented by the State would easily satisfy both elements of the Buie protective sweep search exception.

In the interest of analytical precision, we note defendant's argument suffers from a more fundamental flaw. His contention proceeds from an incorrect characterization of the house search in this case as a protective sweep under <u>Buie</u> and its progeny.[3] In reality, this was not a "protective" sweep search within the meaning of <u>Buie</u> but rather a search for a specified person named in an arrest warrant. Accordingly, that search was authorized under a distinct exception to the warrant requirement—exigent circumstances.

We appreciate that the manner in which the officers methodically proceeded through the house in search of defendant outwardly resembles the technique police might use to conduct a <u>Buie</u> sweep search. After all, as with a <u>Buie</u> sweep search, the officers in this case were only authorized to search for a person, not for weapons, contraband, or other evidentiary objects. Under both warrant exceptions because the object of the search is a living person rather than an inanimate object, the sweep is "narrowly confined to a cursory visual

---

[3] We note that the trial court, and the prosecutor, addressed the lawfulness of the house search in this case as if the <u>Buie</u> doctrine applied. We are not bound to the trial court's legal analysis or its specification of the applicable exceptions to the warrant requirement. As we have noted, although we defer to the fact-finding expertise of the trial court, we construe the Constitution de novo, with "fresh eyes." <u>S.S.</u>, 229 N.J. at 380.

inspection of those places in which a person might be hiding." State v. Bryant, 227 N.J. 60, 70 (2016) (quoting Buie, 494 U.S. at 327).

In other respects, however, these two warrant exceptions are quite different. As our Supreme Court explained in Cope, a Buie sweep search follows an arrest and is designed to protect officers from other persons in the home who may present a danger to officers present in the house by launching a surprise attack. Cope, 224 N.J. at 535, 538, 545. Furthermore, the so-called "radius of danger" that defines the geographic scope of a protective sweep search, see id. at 547 (articulating places officers can and cannot search during a Buie sweep search), is conceptually and analytically distinct from the scope of a search for a specified person named in an arrest warrant.

Although defendant unquestionably posed a danger to the pursuing officers in this case, their authority to search the house was not based solely on that danger, as would be true for a Buie protective sweep search.[4] Rather, under the hot pursuit doctrine, the geographic and temporal scope of a sweep search is defined by the purpose for the police intrusion, which is to find and capture a

---

[4] Our Supreme Court explained that "[t]he rationale for the protective sweep is officer safety," Cope, 224 N.J. at 546, recognizing that "police officers who make an arrest in a home face a great 'risk of danger' because they are 'at the disadvantage of being on [their] adversary's 'turf.'" Ibid. (quoting Buie, 494 U.S. at 333) (second alteration in original).

specific person who had fled into the premises. Accordingly, the pursuing officers in this case were permitted to remain in the house until they had either taken defendant into custody or developed reason to believe he escaped from the premises.[5] While inside, the officers were authorized to search any room or closet within the house where defendant might have been hiding.

Under the Buie protective sweep search doctrine, in contrast, police are not permitted to access and search an area of the dwelling unless they reasonably believe one or more persons are present in that area. See Bryant, 227 N.J. at 70 (noting under the protective sweep search doctrine that "[v]isual or auditory cues are certainly sufficient to establish that another person may be present" (citing Davila, 203 N.J. at 128)). In this instance, it happens that "rustling noises" and the sound of footsteps drew the officers' attention to the second floor. Those "auditory clues" would have authorized the officers to ascend the stairs under the protective sweep search doctrine. The point, however, is that under the hot pursuit exception, police were authorized to look for defendant on the second floor even if he had been completely silent because that is a place where he might have sought refuge from execution of the arrest warrant.

_____

[5] As noted, one officer was assigned to go to the rear of the house to guard against any such escape.

It also bears noting that under the Buie protective sweep doctrine, the second element—that the officers have reasonable suspicion that the area to be searched harbors an individual posing danger—requires proof of an "individualized" suspicion of a risk of danger. As the Court recognized in Bryant, "[t]here is no mathematical formula to determine" whether the police possess an "individualized, rather than generalized, suspicion." 227 N.J. at 70 (first citing State v. Pineiro, 181 N.J. 13, 27 (2004), then quoting Davila, 203 N.J. at 129).

In contrast, under the hot pursuit exception, all persons who flee from the impending execution of an arrest warrant must be deemed to be dangerous to the officers tasked to chase after them. When a person flees into a dwelling to avoid execution of a warrant, pursuing officers need not speculate on the suspect's motivation for flight. Nor do they need to speculate as to the fleeing suspect's planned future course of action once inside the premises. Rather, under the hot pursuit doctrine, the risk of danger to police arises automatically from the same circumstances that justify pursuing a person who is fleeing from the execution of an arrest warrant.

It bears emphasis that our Fourth Amendment jurisprudence has long recognized that custodial arrests by their inherent nature present a danger to

20

police officers, which is only magnified when the arrestee has already resisted police authority by flight. The inherent danger to officer safety that arises from all custodial arrests is one of the reasons why officers are automatically permitted to conduct a search incident to an arrest, even for minor, nonviolent offenses. See State v. Dangerfield, 171 N.J. 446, 462–63 (2002) (authorizing police to conduct a search incident to arrest regardless of the nature or seriousness of the offense for which the defendant is lawfully arrested); see also United States v. Robinson, 414 U.S. 218, 226 (1973) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered . . . .'" (quoting Chimel v. California, 395 U.S. 752, 762–63 (1969))).

For all of the foregoing reasons, we hold that, at least until defendant was captured,[6] the Buie doctrine is simply inapposite in this case. Rather, the search of the house for defendant was authorized by the same exception to the warrant

_____

[6] We note that the Buie doctrine did eventually ripen in this case after police found and arrested defendant. At that moment, the arrest warrant was effectuated and its implicit authority to conduct a search of the premises for defendant expired. The trial court found that the visual inspection of the bedroom from which defendant exited just before he surrendered falls within the ambit of the Buie doctrine. We agree since that area might have harbored a person that defendant went to for aid in resisting arrest.

requirement that authorized the initial police entry—exigent circumstances in the form of a hot pursuit. Indeed, the significant Fourth Amendment privacy intrusion authorized by Jones would be pointless if police could not search the residence for the fleeing suspect. The authority to intrude upon Fourth Amendment privacy rights under the hot pursuit type of exigent circumstances does not suddenly evaporate at the moment law enforcement officers cross the threshold of a residence. Rather, the authority to conduct a warrantless search for the fleeing suspect inside the residence is coextensive and coterminous with the exigency and thus continues until that suspect is apprehended.

C. Police Discovery of the Firearm and Crack Cocaine

Defendant next contends that police had no authority to seize the crack cocaine on top of the bed and the revolver that was partially concealed between the mattress and box spring. The trial court concluded that the discovery and seizure of the firearm and cocaine were authorized under two distinct exceptions to the warrant requirement: the plain view doctrine and the search-incident-to-an arrest doctrine.

To lawfully seize an item in plain view, a three-prong test must be satisfied: (1) the officer must have been lawfully in the viewing area; (2) the

officer must have discovered the evidence "inadvertently;"[7] and (3) the criminality of the item must have been immediately apparent to the officer.  State v. Earls, 214 N.J. 564, 592 (2013) (quoting State v. Mann, 203 N.J. 328, 341 (2010)).

Defendant on appeal challenges only the first prong of the three-part test, claiming the pursuing officers had no authority to enter the house, and once inside, had no authority to be the second floor.  We have already held in the preceding sections of this opinion that the police officers were authorized to enter the home and to look for him on the second floor.  We therefore conclude that for purposes of the plain view exception as well, the State has established that Officer Martinez was lawfully present in the upstairs hallway when he looked into the open bedroom from the hallway and immediately recognized the criminal nature of the packaged crack cocaine and the handle of a revolver.[8]  We

---

[7]  In State v. Gonzales, 227 N.J. 77 (2016), our Supreme Court embraced the United States Supreme Court's decision in Horton v. California, 496 U.S. 128 (1990), and eliminated the "inadvertence" prong.  Gonzales, 227 N.J. at 82.  However, Gonzales applies only prospectively.  Ibid.  In this instance, the search was conducted before Gonzales was decided on November 15, 2016.

[8]  The trial court determined that after Officer Martinez placed defendant under arrest in the hallway, the officer was permitted to conduct a limited protective sweep of the bedroom.  We agree the bedroom was "immediately adjoining the place of arrest from which an attack could be immediately launched."  Cope,

also agree with the trial court that it was objectively reasonable for Officer Martinez to peer into the room from which defendant had just emerged. We therefore affirm the trial court's conclusion that:

> The seizure of the gun and drugs met the plain view exception to the warrant requirement as Officer Martinez was lawfully in the hallway when he first saw the items on the bed; his discovery of the items was inadvertent in that he did not know in advance that the gun and drugs would be found in the bedroom nor intended to seize them beforehand; and it was immediately apparent to him, based on his experience, that the items were contraband.

The trial court also found that the revolver and crack were lawfully seized incident to defendant's arrest pursuant to Chimel. In Chimel, the Court held that when an officer effectuates an arrest, he or she may search the "arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area within which he might gain possession of a weapon or destructible evidence." 395 U.S. at 763; see also State v. Eckel, 185 N.J. 523, 535 (2006) ("New Jersey's traditional approach to [a] search incident to arrest parallels Chimel.")

---

224 N.J. at 547 (quoting Buie, 494 U.S. at 334). The officer in these circumstances could reasonably believe that defendant had retreated to that bedroom to get assistance from another person.

A-2457-17T1

In this case, the record indicates that defendant was already outside the bedroom when he surrendered to police, was ten feet away from the bed when he was arrested, and was already handcuffed when police entered the bedroom to retrieve the weapon and contraband. Because we conclude the revolver and crack cocaine in the bedroom were lawfully seized under the plain view doctrine, we need not address whether those items were within defendant's immediate control within the meaning of Chimel at the time of his arrest.

## D. Consent Search

Finally, we address defendant's contention that the consent to search given by his grandmother was involuntary.[9] The gravamen of defendant's argument is that police obtained her consent by coercion. Specifically, defendant argues that she was emotionally upset by the manner in which the officers forcibly entered her home and told her to stay in her first-floor bedroom for her own safety as they searched the house for her son.

After reviewing the record in light of the legal principles relating to the consent search doctrine, we agree with the trial court that her consent was given

---

[9] The police found and seized the digital scale, $2856 in cash, plastic baggies, and the Pyrex cup with cocaine residue pursuant to the consent doctrine. The firearm and crack cocaine were seized before defendant's grandmother signed the consent-to-search form and so the admissibility of the gun and cocaine does not depend on the consent doctrine.

knowingly and voluntarily. See State v. Johnson, 68 N.J. 349 (1975) (generally explaining the consent doctrine under the New Jersey Constitution); Elders 192 N.J. at 246 (requiring the State establish the applicability of the consent search doctrine by a preponderance of the evidence). Aside from the explanation of rights set forth in the body of the consent form, an officer advised her orally of her right to refuse consent, her right to revoke consent at any time, and her right to be present while the search was conducted. She signed the form indicating that the consent was given "voluntarily and without threat or promises of any kind." This was all done after the exigencies of the forcible entry and arrest had passed and the stresses associated with the pursuit had calmed down. Defendant had surrendered and was taken into custody without resort to violence and was already out of the house when his grandmother signed the consent form. On the record before us, we are thus persuaded by the trial court's interpretive conclusion with respect to the voluntariness of the consent search. See Morrison, 227 N.J. at 308 (permitting deference to the trial court when persuaded by its reasoning).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2457-17T1